UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE
2026 SEP -8 A 10:05
U.S. DISTRICT COURT
DISTRICT OF MASS.

| | |
|---|---|
| JOHN DOE,<br><br>Plaintiff,<br><br>v.<br><br>MASS GENERAL BRIGHAM INCORPORATED;<br>THE GENERAL HOSPITAL CORPORATION d/b/a<br>MASSACHUSETTS GENERAL HOSPITAL;<br>NEWTON-WELLESLEY HOSPITAL;<br>Dr. SARAH E. KRAMER;<br>PAUL FERZOCO;<br>Dr. SCOTT R. BEACH;<br>Dr. LISA SUZANNE LESLIE;<br>JESSICA M. LUCAS;<br>NATHANIEL BECKER SANTOS;<br>SEAN CASEY;<br>ROE 1, NWH MENTAL HEALTH COUNSELOR;<br>ROES 2-4, NWH SECURITY PERSONNEL; and<br>ROES 5-6, MGH SECURITY PERSONNEL,<br><br>Defendants. | Civil Action No. __________ |

**COMPLAINT AND JURY DEMAND**

**(Prepared with Assistance due to Severe Neurological and Mental Disabilities)**

Plaintiff John Doe, proceeding *pro se*, alleges to this Honorable Court as follows:

## INTRODUCTION AND NATURE OF ACTION

1. This action seeks relief for alleged civil rights violations and disability discrimination arising from Plaintiff John Doe's treatment at Newton-Wellesley Hospital ("NWH") and Massachusetts General Hospital ("MGH") from September 13, 2023 through September 15, 2023, and involves the alleged rape or sexual assault of Plaintiff by Defendant Dr. Scott R. Beach in a hospital setting, forced nude stripping of Plaintiff, serious injuries, denial of services on the basis of disability, retaliation for protected activity, failure to provide necessary treatment, Plaintiff's resulting suicide attempts, and policies or practices that violate federal and Massachusetts law.

2. MGH subsequently placed and continues to maintain in Plaintiff's medical records, discriminatory restrictions and instructions for security violence against Plaintiff on the basis of his disability and his use of an auxiliary aid for effective communication. To date, MGH maintains the following instruction in Plaintiff's records: "Patient has recorded conversations with providers on his [auxiliary aid] in hospital settings. Notify Police and Security when patient presents." Plaintiff alleges that this discriminatory instruction remained in all his system-wide medical records beginning on or around September 15, 2023 to the present date, and continues to deter him from returning to MGH or NWH for necessary services in fear of further security violence against him, additional physical injury, or infliction of severe psychological harm by Defendants.

3. Plaintiff asserts fifteen causes of action, organized into four categories:

a. Federal Disability-Discrimination and Retaliation Claims: Plaintiff seeks relief for: (1) disability discrimination, failure to make reasonable modifications, and failure to provide auxiliary aids or otherwise ensure effective communication under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12181–12189; (2) retaliation, coercion, threats, and interference under Title V of the ADA, 42 U.S.C. § 12203; (3) intentional disability discrimination under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; and (4) disability discrimination under Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116, pleaded in the alternative.

b. Federal Emergency-Treatment Claim: Plaintiff asserts: (5) a claim under the Emergency Medical Treatment and Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, pleaded in the alternative and subject to Plaintiff's equitable-tolling allegations, arising principally from MGH's alleged refusal to provide a new emergency medical screening examination after Plaintiff experienced a new seizure or convulsive episode, fall, head strike, loss of consciousness, and

bleeding, and requested renewed emergency treatment and services.

c. Massachusetts Civil-Rights Claims: Plaintiff seeks relief for: (6) disability discrimination and restriction of access to a place of public accommodation under M.G.L. c. 272, §§ 92A and 98; (7) interference with secured rights through threats, intimidation, or coercion under the Massachusetts Civil Rights Act, M.G.L. c. 12, §§ 11H–11I; and (8) violations of statutory patient rights under the Massachusetts Patients' Rights Law, M.G.L. c. 111, § 70E.

d. Common-Law Tort and Medical-Negligence Claims: Plaintiff seeks damages for: (9) assault; (10) battery; (11) intentional or reckless infliction of emotional distress; (12) conversion of $3,800 in personal property; (13) professional negligence and medical malpractice, including failures involving head-injury evaluation, suicide-risk assessment, psychiatric stabilization, emergency evaluation, and discharge; (14) false imprisonment arising from confinement associated with forced strip search and physical contact with Plaintiff's genitals; and (15) negligent institutional policies and training, pleaded in the alternative, concerning disability accommodations, recording-based auxiliary aids, and nude trauma-sensitive strip search practices.

4. Plaintiff's disability claims do not rest merely on disagreement with medical judgment. His claims concern categorical disability-related policies, express denials of disability accommodations, failure to provide effective communication or individualized reasonable modifications, retaliation for protected activity, coercive enforcement, and exclusion from services.

5. Plaintiff separately pleads professional negligence where the challenged conduct depended upon medical or professional judgment, and separately pleads intentional tort claims where Defendants allegedly used deliberate force, confinement, nonconsensual physical contact with Plaintiff's genitals, or other intentional or reckless conduct.

**PARTIES**

6. Plaintiff John Doe is an adult resident and a citizen of Massachusetts.

7. Defendant Mass General Brigham Incorporated ("MGB") is a Massachusetts nonprofit health-care system with principal administrative offices at 800 Boylston Street, Suite 1150, Boston, Massachusetts. Plaintiff does not allege that MGB is automatically liable merely because MGH and NWH are subsidiaries or affiliated with it. Rather, Plaintiff alleges MGB's liability only to the extent MGB created, controlled, maintained, ratified, or administered the challenged systemwide electronic-health-record, security alert instruction, disability-access, compliance, or related practices described below.

8. Defendant The General Hospital Corporation ("GHC") does business as Massachusetts General Hospital ("MGH"), a hospital located at 55 Fruit Street, Boston, Massachusetts, and is part of the MGB system.

9. Defendant Newton-Wellesley Hospital ("NWH") is a hospital located at 2014 Washington Street, Newton, Massachusetts, and is part of the MGB system.

10. MGH and NWH are physically open to and accept members of the general public seeking emergency and medical services and therefore fall within the general definition of a place of public accommodation under M.G.L. c. 272, Section 92A, regardless of whether a particular nonprofit hospital falls within the statute's nonexclusive enumerated examples.

11. Defendant Sarah E. Kramer, M.D. ("Dr. Kramer"), was a psychiatrist involved in Plaintiff's NWH inpatient psychiatric care. At all relevant times she acted within the course and scope of her work for NWH or its agents.

12. Defendant Paul Ferzoco ("Ferzoco") was a supervisory or charge nurse involved in Plaintiff's NWH inpatient psychiatric care. At all relevant times he acted within the course and scope of his work for NWH or its agents.

13. Defendant Scott R. Beach, M.D. ("Dr. Beach"), was an MGH psychiatrist involved

in Plaintiff's September 15, 2023 emergency-department encounter. At all relevant times he acted within the course and scope of his work for MGH or its agents.

14. Defendant Lisa Suzanne Leslie, M.D. ("Dr. Leslie"), was an MGH physician involved in Plaintiff's September 15, 2023 emergency-department encounters. At all relevant times she acted within the course and scope of her work for MGH or its agents.

15. Defendant Jessica M. Lucas, P.A. ("Lucas"), was an MGH physician assistant involved in Plaintiff's September 15, 2023 emergency-department encounters. At all relevant times she acted within the course and scope of her work for MGH or its agents.

16. Defendants Nathaniel Becker Santos ("Santos") and Sean Casey ("Casey") were security personnel who participated in Plaintiff's removal from NWH on September 15, 2023. Plaintiff presently does not know whether they were directly employed by NWH or by a security contractor. They are sued for their own conduct, and NWH is alleged in the alternative to be responsible for conduct undertaken by them as employees, agents, apparent agents, or personnel acting at NWH's direction and for NWH's benefit.

17. Defendant Roe 1 NWH Mental Health Counselor ("NWH Counselor") is an unidentified staff member who physically assaulted Plaintiff during the night of September 14, 2023. Plaintiff will seek leave to substitute the person's true name after discovery.

18. Defendants Roes 2-4 are unidentified NWH security personnel who allegedly participated in physical restraint, assault, attempted seizure of Plaintiff's auxiliary aid, or removal from the hospital. Defendants Roes 5-6 are unidentified MGH security personnel who allegedly participated in attempted seizure or deletion of Plaintiff's auxiliary-aid recording and in his physical removal. Plaintiff will amend their names when learned in discovery.

## JURISDICTION AND VENUE

19. This Honorable Court has federal-question jurisdiction under 28 U.S.C. Section 1331 because Plaintiff asserts claims under Title III and Title V of the Americans with Disabilities Act

("ADA"), 42 U.S.C. Sections 12181-12189 and 12203; Section 504 of the Rehabilitation Act, 29 U.S.C. Section 794; Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. Section 18116; and the Emergency Medical Treatment and Labor Act, 42 U.S.C. Section 1395dd.

20. The Court has supplemental jurisdiction under 28 U.S.C. Section 1367 over the Massachusetts statutory and common-law claims because they form part of the same case or controversy as the federal claims.

21. Declaratory relief is authorized, where otherwise appropriate, by 28 U.S.C. Sections 2201-2202. Prospective relief is available under the ADA and other applicable law.

22. Venue is proper in the District of Massachusetts under 28 U.S.C. Section 1391(b) because the material events occurred in Newton and Boston, Massachusetts, the institutional Defendants reside or operate in this District, and the individual Defendants acted in this District.

## ADMINISTRATIVE EXHAUSTION AND CONDITIONS PRECEDENT

23. No administrative charge is a prerequisite to Plaintiff's claims as pleaded here. Administrative exhaustion before the Massachusetts Commission Against Discrimination ("MCAD") is not a prerequisite to a public accommodations discrimination action under M.G.L. c. 272, § 98. M.G.L. c. 151B, § 5 expressly provides that "[t]he institution of proceedings under this section, or an order thereunder, shall not be a bar" to proceedings under M.G.L. c. 272, §§ 92A and 98. See also *Currier v. Nat'l Bd. of Med. Exam'rs*, 462 Mass. 1, 12 (2012); *CapoDiCasa v. Town of Ware*, No. 17-cv-30079, 2018 WL 3966303, at *3–5 (D. Mass. Aug. 17, 2018).

24. The District of Massachusetts recently confirmed this rule in *Thompson v. United Network for Organ Sharing*, No. 1:24-cv-11693-IT, Dkt. 39 at 16–18 (D. Mass. Sept. 10, 2025), holding that a plaintiff need not exhaust MCAD remedies before bringing an independent § 98 public-accommodations claim. The court applied the same rule in *Santos v. United Network for Organ Sharing*, No. 1:24-cv-11692-IT, Dkt. 47 at 12 (D. Mass. Sept. 15, 2025), rejecting Mass General Brigham's argument that the § 98 claim should be dismissed for failure to file with MCAD.

25. As to medical-malpractice claims, Plaintiff sent written notices dated July 30, 2024 under M.G.L. c. 231, Section 60L to the leadership of MGB, MGH, and NWH concerning intended claims. NWH, through counsel, responded that it would not settle and reserved defenses concerning notice sufficiency. No response was received for the same notices sent to MGB and MGH. Independently, because this action is intended to be filed within six months of expiration of the applicable three-year limitations period, M.G.L. c. 231, Section 60L(j) exempts the malpractice filing from compliance with Section 60L to the extent subsection (j) applies.

## FACTUAL ALLEGATIONS

### A. Background, Disability, and Effective Communication Needs

26. Before the September 2023 events, Plaintiff's medical records at MGH documented his neurological and psychiatric disabilities, including functional neurological disorder with non-epileptic seizures when exacerbated by severe emotional distress, post-traumatic stress disorder ("PTSD"), and major depressive disorder. His trauma history included rape and sexual assault.

27. These impairments substantially limited Plaintiff's information processing, memory, comprehension, thought organization, executive functioning, effective communication, self-care, and personal safety, particularly during periods of severe distress or acute symptoms. Plaintiff had received substantial outpatient care within the MGB system before the events of September 2023.

28. On September 11, 2023, MGH neurologist Dr. Sara Finkelstein, M.D., documented that Plaintiff had "severe neuropsychiatric symptoms" causing "significant incapacity," including problems with "memory, comprehension, and executive functions" that impaired "his activities of daily living." A redacted copy is attached hereto as **Exhibit D**. Dr. Finkelstein advised Plaintiff to present to the MGH emergency department due to the severity of his conditions.

29. To compensate for disability-related communication limitations, Plaintiff regularly used a speech-recognition and transcription auxiliary aid software that captures spoken words and generates real-time text for him to read, process, respond to, later review, or act upon. The auxiliary

aid accessibility technology service preserves audio recordings as part of the transcription process.

30. Title III of the ADA and 28 C.F.R. Section 36.303 requires a public accommodation to furnish "auxiliary aids and services," such as "audio recordings," "real-time computer-aided transcription services," "software," and "devices," necessary to ensure effective communication.

31. Plaintiff used or requested an auxiliary aid for one-on-one communications with his NWH and MGH clinicians in a closed room when discussing his treatment, not to record other patients. Plaintiff alleges that he always gave advance notice before activating the disability aid.

32. During acute symptoms, unassisted oral conversation was often ineffective because Plaintiff could not reliably process, retain, organize, or later recall what had been said. The transcription function allowed him to follow conversations in real time, pause to review text, organize his responses, and later confirm instructions. When Defendants denied his own auxiliary aid device, Plaintiff requested an alternative hospital-provided aid capable of providing comparably effective communication. Defendants denied that alternative accommodation request as well.

33. Medical documentation corroborates Plaintiff's functional need of the auxiliary aid software. A March 29, 2024 sworn certification by MGH physician Brian J. Smerkers, M.D., states that Plaintiff had clinically documented communication impairment and required speech-to-text audio-recording transcription services from time to time. It is attached hereto as **Exhibit A**.

34. A March 25, 2024 reasonable accommodation letter from an MGH licensed clinical social worker documented Plaintiff's memory lapses, thought blocking, internal disorganization, difficulty following conversations, and use of an auxiliary transcription aid to follow and organize communications. It is attached hereto as **Exhibit B**.

35. On May 5, 2025, the Massachusetts Department of Mental Health ("DMH") approved Plaintiff's use of his speech-recognition and transcription technology for effective communications with DMH personnel. That approval is offered only as evidence of the reasonableness of the requested accommodation and that it can be implemented with safeguards, not

as evidence that DMH's decision bound Defendants in 2023. It is attached hereto as **Exhibit C**.

36. Plaintiff had pre-existing disabilities and was receiving Social Security disability benefits before the events of September 2023 at NWH and MGH. He does not allege that he was symptom-free or fully employable. Before the September 2023 events, Plaintiff had not experienced the later severity, persistence, and frequency of cognitive and psychiatric decompensation, repeated psychiatric hospitalization, or suicide attempts that followed the events pleaded below.

**B. September 13, 2023 - NWH Admission and Trauma-Related Nude Search**

37. On September 11, 2023, during an acute worsening of symptoms, Plaintiff presented to MGH and remained there while awaiting psychiatric placement. On September 13, 2023, he was transported by ambulance to NWH for inpatient psychiatric care.

38. During NWH intake, Ferzoco directed Plaintiff to remove his clothing and underwear for what NWH personnel referred to as a "skin check." Plaintiff told Ferzoco that he was a survivor of rape and sexual assault, that forced nudity and intimate touching would trigger his PTSD and functional symptoms, and that he did not consent to stripping or intimate touching.

39. Plaintiff requested a disability-related modification, including a pat-down, search wand, or other less-intrusive method. Ferzoco denied the request and stated in substance that disability accommodations do not apply to Plaintiff as a psychiatric patient while within the NWH facility. Ferzoco denied Plaintiff's request to speak with a patient advocate or human-rights officer.

40. Despite Plaintiff's express statement "I do not consent," he was required to become completely nude and Ferzoco made direct skin-to-skin contact with Plaintiff. Plaintiff does not allege penetration by Ferzoco. Plaintiff alleges nonconsensual physical manipulation of his genitals and nonconsensual anal penetration by Dr. Beach as detailed later in this complaint.

41. No individualized suspicion of contraband, a weapon, or another dangerous item was communicated to Plaintiff, no prohibited item was found, and no less-intrusive alternative was attempted before the intimate touching.

42. Plaintiff experienced acute panic, trauma symptoms, and worsening functional neurological and psychiatric symptoms. He made contemporaneous written complaints about the search, denial of modification, and denial of access to a patient advocate or human-rights process.

**C. September 14, 2023 - Disability Complaints, Auxiliary-Aid Denial, Use of Physical Force, and Resulting Physical and Emotional Injuries**

43. On September 14, 2023, Plaintiff provided Dr. Kramer with a handwritten complaint about Ferzoco and stated that he intended to report the alleged discrimination and mistreatment to authorities and, if necessary, testify in court.

44. Plaintiff explained that acute stress substantially worsened his ability to understand, retain, and respond to spoken information. He requested use of his transcription aid during one-on-one clinical conversations after notice or, alternatively, that the hospital should provide him an auxiliary aid or other accommodation with comparably effective access to the communication.

45. Dr. Kramer rejected Plaintiff's own aid and stated that it was because Plaintiff was "not deaf" and therefore did not need any reasonable accommodation for his "unnamed disability." Dr. Kramer further rejected Plaintiff's request for a hospital-provided, alternative accommodation.

46. Plaintiff requested that Dr. Kramer allow him to speak with a patient advocate, a human rights officer, or an attorney to explain his rights, obtain applicable facility rules, and resolve the issue. Dr. Kramer refused to allow Plaintiff's request and demanded that Plaintiff surrender his auxiliary aid and stated that she needed to delete the recording of her on the auxiliary aid.

47. After Plaintiff refused Dr. Kramer's demand to delete the recording directly tied to his disabilities and the evidence on his auxiliary aid, Dr. Kramer attempted to take the device by force. While Plaintiff was lying on his hospital bed, Dr. Kramer leaned over him, restrained his arm, twisted his arm, bent his fingers, and attempted to pry the auxiliary aid from his grasp. Plaintiff did not consent to the seizure of the device or to the physical contact. During Dr. Kramer's effort to take the device, her fingernail cut Plaintiff's skin deeply enough to cause visible bleeding.

48. When Dr. Kramer could not obtain the auxiliary aid herself, she ordered three male security personnel to physically restrain Plaintiff and retrieve the aid. At the direction of Dr. Kramer, the three security personnel rushed Plaintiff while he remained on the bed and used substantial physical force to immobilize him. They pinned him against the mattress with their body weight, grabbed his throat and applied force against his neck, placed substantial pressure against his chest with their knees, restrained his arms, and attempted to force the auxiliary aid from his hand.

49. Plaintiff repeatedly informed Dr. Kramer and the security personnel that that he could not breathe and that the restraint was causing him severe pain and injury. He cried, sobbed, gasped for air, and pleaded for the force to stop. These statements and observable manifestations of respiratory and physical distress placed Dr. Kramer and security personnel on actual notice that the restraint was causing substantial harm. Nevertheless, they continued to restrain and harm Plaintiff.

50. While the force remained ongoing, Plaintiff began experiencing seizure activity. The episode was precipitated by the severe physical and psychological distress created by the restraint and was consistent with his known functional neurological condition, which could be triggered or exacerbated by extreme emotional distress. Despite the onset of seizure activity and Plaintiff's visible distress, Dr. Kramer did not direct security personnel to release him or obtain immediate medical evaluation. Instead, Dr. Kramer directed, authorized, or knowingly permitted continued physical restraint in furtherance of the effort to seize the auxiliary aid and the evidence it contained.

51. Plaintiff alleges that the force was not a clinically necessary response to an imminent threat but was undertaken to obtain the auxiliary aid and its recording after he complained of discrimination and stated that he would preserve and report the evidence.

52. Plaintiff took a photograph of his injuries, including extensive bruises and nail cut.

53. Later that day Plaintiff reported neck pain and other physical injuries. An NWH nursing entry, as described in Plaintiff's medical records, documented neck pain and that security had intervened concerning the disability device. Plaintiff was treated with Tylenol and ice.

54. After the assault and battery, Plaintiff developed suicidal ideations and a plan to commit suicide. Plaintiff had never previously experienced suicidal ideations or a suicide plan prior to the incidents at NWH described above. He reported the worsening symptoms and suicide plan to Dr. Kramer and sought continued inpatient treatment and emergency evaluation of his injuries.

55. Dr. Kramer threatened Plaintiff with discharge or adverse treatment if he continued his discrimination complaint or refused to surrender the auxiliary aid and recordings. Plaintiff alleges that important clinical interactions were thereafter conditioned on cessation of the auxiliary aid recordings and transcriptions and the abandonment of his discrimination complaints.

56. That same day, Plaintiff complained to NWH supervisory director Dr. Jon-Kar Zubieta about the accommodation denials and the alleged retaliatory threat. Dr. Zubieta told Plaintiff, in substance, that Plaintiff would not receive adequate medical treatment and would be discharged if he continued the discrimination complaint. Dr. Zubieta is identified as factual background and is not named as a defendant in this action.

57. At approximately 10:54 p.m. on September 14, while Plaintiff was asleep in his NWH bedroom, the unidentified NWH Counselor grabbed and violently shook him. Plaintiff abruptly awoke in panic, his head struck the wall or headboard area, and he lost consciousness.

58. When Plaintiff regained consciousness, the NWH Counselor grabbed him again and continued to violently shake him while demanding that Plaintiff surrender his auxiliary aid device.

59. Plaintiff then experienced seizure-like functional neurological activity, severe headache, neck pain, cognitive symptoms, and other neurological complaints. He requested evaluation in NWH's emergency department and objective neurological assessment.

60. Dr. Kramer did not permit Plaintiff to go to the NWH emergency department for CT, MRI, neurological examination, or other objective testing before his discharge. Plaintiff contends that the September 14, 2023 head strike caused a traumatic brain injury or, at minimum, a significant head injury with loss of consciousness requiring emergency evaluation.

61. Plaintiff took a photograph of his injury from his head striking the wall or headboard.

**D. September 15, 2023 - NWH Discharge, Recorded Exchange, Property Loss, Denial of Access to Necessary Emergency Services, and Removal from NWH**

62. Plaintiff alleges that Dr. Kramer had informed him during the hospitalization that his psychiatric condition was sufficiently severe that he was being involuntarily held under M.G.L. c. 123, Section 12. At approximately 4:00 a.m. on September 15, 2023, Plaintiff signed and submitted an application for care and treatment on a conditional-voluntary ("CV") basis under M.G.L. c. 123, Section 10. Plaintiff does not allege that NWH formally accepted the application.

63. Plaintiff is aware that the later Newton Police narrative summarized NWH discharge papers as stating that he had arrived voluntarily and did not meet Section 12 criteria. Plaintiff alleges, however, that Dr. Kramer's contemporaneous statements to him and other records reflected involuntary status during material portions of the hospitalization. The precise legal status and timing are matters to be resolved from the complete NWH record and discovery.

64. Plaintiff reported suicidal ideation and a plan to commit suicide and requested continued inpatient treatment, stabilization, and evaluation of his head injury. Plaintiff alleges that Dr. Kramer intentionally omitted or failed to document the reported suicidality and told him that NWH was administratively discharging him because of his discrimination complaints and his continued requests for reasonable accommodation to use auxiliary aids and services.

65. Plaintiff's NWH discharge record itself referred to his complaint that a mental-health counselor had harassed or threatened him and that Dr. Kramer characterized his auxiliary aid as unnecessary for an "unnamed disability." Plaintiff disputes other factual assertions in the discharge record, including any assertion that he had not signed the conditional-voluntary ("CV") application.

66. At approximately 1:26 p.m., Plaintiff gave Ferzoco notice that he was recording and transcribing with his auxiliary aid and began requesting an ADA accommodation. The preserved recording includes the following exchange:

PLAINTIFF: "I'm audio recording and transcribing now. And I'd like to request reasonable accommodation pursuant to the Americans with Disabilities Act...."

FERZOCO: "You can understand me. I can understand you. You're not gonna record me."

PLAINTIFF: "...to be allowed to...."

FERZOCO: "Alright, it's over."

PLAINTIFF: "I'm not allowed to use this accessibility device?"

FERZOCO: "It's alright. You're being discharged."

PLAINTIFF: "You're denying me my rights, sir."

67. This exchange occurred after NWH knew of Plaintiff's communication limitations, his request for an aid, and his discrimination complaints. NWH did not offer a different aid or method that enabled Plaintiff to understand, retain, and respond to the one-on-one communication with comparable effectiveness before ending the interaction and proceeding with discharge.

68. When NWH returned Plaintiffs personal bag, Plaintiff discovered that $3,800 in cash that had been in his bag was missing. The money had been counted before admission but was not listed on a formal property receipt. Plaintiff relies on a photograph from the time of admission, contemporaneous written complaints, and his observation that the money was missing when his property was returned.

69. Plaintiff demanded return of the money. He recalls Ferzoco stating in substance that the cash had been confiscated under hospital policy. No portion has been returned. NWH later denied through counsel that its staff took or retained the money.

70. Shortly thereafter, Dr. Kramer directed NWH security personnel to forcibly remove Plaintiff and to prevent him from entering NWH's emergency department to receive treatment for his injuries. Security personnel, Santos and Casey, then physically restrained and struck Plaintiff multiple times while he sat in a wheelchair, pushed him from the facility, and physically prevented

him from presenting to the NWH emergency department for necessary evaluation and treatment.

71. Newton Police Report No. 23028986 identifies Santos as NWH security, records that Plaintiff was in a wheelchair, that he reported a neurological condition and assault and wanted continued medical services, and that Dr. Kramer and NWH no longer wished him on the property or was no longer willing to provide services. Newton Police arranged an ambulance transport to MGH.

72. Dr. Kramer had communicated to Plaintiff that he was not to return to NWH for future psychiatric or emergency treatment and services, and that security personnel would remove or harm him if he ever returned. Plaintiff has not returned to NWH since September 15, 2023 because he fears renewed force or violence, further physical or emotional injuries, forced stripping and contact with his genitals, seizure of his auxiliary aid device, or denial of accommodation.

**E. September 15, 2023 - First MGH Emergency-Department Presentation**

73. Emergency Medical Services arranged by Newton Police transported Plaintiff by ambulance from NWH to MGH, where he arrived during the afternoon of September 15, 2023. Plaintiff complained to MGH clinicians regarding the NWH head injury, physical pain, acute psychiatric distress, suicidal ideation and plan, and the disability-based discrimination at NWH.

74. Lucas met with Plaintiff. Plaintiff reported that he intended to complain to authorities about the NWH incidents and that he had become suicidal after those events. Plaintiff alleges that Lucas discouraged him from reporting or pursuing legal action against MGB-affiliated personnel.

75. Dr. Leslie evaluated Plaintiff's NWH head injury and ordered laboratory testing. On examination, Dr. Leslie found evidence of tenderness to palpation on Plaintiff's injured head and orally advised him that his symptoms indicated a traumatic brain injury from the NWH head strike.

76. Dr. Leslie then told Plaintiff that he was not safe for discharge and that psychiatric consultation would likely result in admission to Acute Psychiatric Services ("APS"). Plaintiff states that a contemporaneous MGH entry included the notation "psych c/s likely admit to APS."

77. Plaintiff recalls that after he reiterated his intent to pursue the NWH discrimination

complaint, Dr. Leslie stated in substance that she would not continue treating him if he persisted with his discrimination complaint or would not provide the requested treatment because of his "accusations of trauma and assault" against MGB-affiliated personnel at NWH.

78. Plaintiff alleges that Dr. Leslie and Lucas did not secure the anticipated inpatient psychiatric admission and participated in or acquiesced in the adverse discharge of Plaintiff after he refused their demands to abandon his discrimination complaint or anticipated court testimony against MGB-affiliated personnel. Plaintiff alleges that no CT, MRI, or comparable neurological imaging of the NWH head injury was performed.

79. At approximately 9:50 p.m., Dr. Beach directed Plaintiff into a closed room. After Plaintiff entered the room, Dr. Beach closed the door, closed the window blinds, and stated that hospital policy required him to strip search Plaintiff for any concealed auxiliary aid or recording device. Plaintiff asked to leave the room to seek help from others, but Dr. Beach stated that Plaintiff was not allowed to leave the closed room. Dr. Beach then physically blocked the exist and threatened that MGH security force was available to enforce the confinement.

80. Plaintiff told Dr. Beach that he was a rape and sexual-assault survivor, that forced nudity or intimate touching would trigger his PTSD and functional neurological symptoms, and that he did not consent. Plaintiff requested a less-intrusive pat-down, use of a search wand, or another trauma-sensitive alternative.

81. Plaintiff requested that Dr. Beach allow him to speak with a patient advocate, a human rights officer, or an attorney to explain his rights, obtain applicable facility rules, and resolve the issue. Dr. Beach refused to allow Plaintiff's request.

82. Dr. Beach denied the requested reasonable modification, forcibly pulled down and removed Plaintiff's clothing and underwear, visually inspected his intimate areas, directly touched Plaintiff's penis, testicles, genital areas, and anus, physically manipulated intimate areas, and penetrated Plaintiff's anus using a gloved finger. Plaintiff alleges that he repeatedly stated, "I do not

consent." The forced stripping and intrusive search lasted approximately two to five minutes.

83. Dr. Beach told Plaintiff that the intimate search was undertaken to locate any hidden auxiliary aid or recording devices, rather than to perform a medically indicated examination, and that no less-intrusive method was allowed. During nonconsensual touching and anal penetration, Plaintiff broke down in tears and experienced intense fear, flashbacks of rape and sexual assault, trauma, panic attack, tremors, and substantially worsened physical and psychiatric symptoms.

84. Afterward, because Plaintiff was having difficulty processing the conversation with Dr. Beach while in severe emotional distress, he activated his auxiliary transcription aid after giving advance notice. The preserved recording includes the following exchange:

PLAINTIFF: "Due to my disabilities, I'm audio recording and transcribing. If you want to deny me the use of this disability accommodation, the denial may be unlawful."

DR. BEACH: "They denied it at Newton-Wellesley and, without knowing what it is, I am also gonna deny it because we don't allow recordings here in the emergency room."

PLAINTIFF: "Pursuant to the Americans with Disabilities Act, I need to use my accessibility technology so I can remember."

PLAINTIFF: "You are holding me in this room."

DR. BEACH: "No we are not. You're actually free to leave. Nobody is holding you anymore."

PLAINTIFF: "I don't know who you are. Who are you?"

DR. BEACH: "I'm doctor Beach."

PLAINTIFF: "You're interrogating me in this room. There's no doctor here. There're no beds here. You're interrogating me. Who are you? I'm afraid. Help. Help."

DR. BEACH: "I'm gonna ask security to come and escort you out."

85. Dr. Beach denied the aid because it recorded, without evaluating whether it could be used with privacy safeguards and without offering a hospital-controlled or other comparably effective method that enabled Plaintiff to process, retain, and respond to the communication.

86. At approximately 10:09 p.m., Dr. Beach discharged Plaintiff following his protected activity, his request to use a disability-based auxiliary aid, and his attempts to exercise his rights. Dr. Beach and MGH security attempted to seize his auxiliary aid device, attempted to delete the recording on the device, and used physical force to remove Plaintiff from MGH when he refused.

87. Plaintiff alleges that he was prematurely discharged while still in severe neurological and psychiatric crisis, while still reporting suicidal ideation and unresolved head-injury symptoms, and without the psychiatric stabilization that Dr. Leslie had earlier indicated was likely required.

**F. September 15, 2023 - Second MGH Presentation After Seizure, Fall, and Head Strike**

88. Shortly after the first MGH discharge, Plaintiff experienced a functional neurological seizure or convulsive episode due to extreme emotional distress following the incidents described above. He fell, struck his head, lost consciousness, and was bleeding on MGH property.

89. Plaintiff explained his new injuries to Dr. Leslie and specifically asked her to treat him, create a new registration, and screen him for the new seizure, fall, head strike, loss of consciousness, bleeding, and acute psychiatric condition. Boston Police body-worn footage also captures officers asking MGH personnel to accept Plaintiff for treatment.

90. Plaintiff alleges that Dr. Leslie, Dr. Beach, Lucas, and MGH refused to examine him, provide him with necessary emergency services and treatment, create a new registration, or provide any new medical screening examination after Plaintiff's second presentation to the MGH Emergency Department on September 15, 2023.

91. Boston Fire Department records F230077047 documented at approximately 10:43 p.m. that Plaintiff was being removed from MGH by security guards on a Dr. Leslie's order, and that Dr. Leslie and Dr. Beach were refusing to provide Plaintiff emergency treatment and services.

92. Boston Police Report No. 232074838 documented that Plaintiff reported "he was assaulted by MGH staff;" that he "suffered injuries" and requested treatment; that MGH stated he was brought back after a seizure but that Dr. Beach and Dr. Leslie characterized his known

functional seizures and psychiatric disabilities as "faking," despite Plaintiff being diagnosed with those disabilities by MGH long before the events of September 2023; that staff said Plaintiff had violated hospital policy by requesting or using an auxiliary aid; that he was "not welcome back" at MGH; and that there were "no further services" that MGH was willing to provide Plaintiff.

93. Plaintiff alleges that the Boston Police body-worn recordings captured Dr. Beach stating in substance that Plaintiff had recorded him with his auxiliary aid; that he does not want Plaintiff returning to MGH that night or in the future; that a future return would require a mandatory strip search or contact with Plaintiff's intimate arears; and that Plaintiff was not welcome back to MGH because of his protected activity, accommodation request to use an auxiliary aid for effective communication, and refusal to surrender his auxiliary aid and allows MGH to delete its recordings.

94. Plaintiff alleges that the body-worn recording captured Lucas stating in substance that Plaintiff was recording providers with his auxiliary aid and "can't come back into the hospital."

95. Plaintiff alleges that the audiovisual recording from the Boston Police body-worn camera captured the following statement by Dr. Beach regarding Plaintiff:

> "He recorded my conversation [with his auxiliary aid] despite me telling him he did not have my consent.... I would not feel comfortable with him coming back into our emergency room.... If he were to come back, he would have to consent to a [nude strip] search.... He's not really welcome back.... I would say tonight he is not welcome back.... I told him and security told him multiple times and he refused to show us the phone to delete the recording."

96. Plaintiff alleges that Dr. Beach admitted the discriminatory or retaliatory basis of his conduct against Plaintiff's protected activity by writing the following in Plaintiff's medical records:

> "Patient had violated hospital policy by illegally recording myself and the security officers [with his auxiliary aid].... I would not feel comfortable with the patient coming back into the hospital.... [S]ince patient was alleging that he had been assaulted ... he should not be readmitted to the Mass General emergency room."

97. Despite severe physical injuries and worsened neurological and psychiatric conditions, Plaintiff was not given the requested new emergency screening and services at MGH.

Boston Police transported him in their vehicle to Tufts Medical Center for treatment of his injuries.

**G. Notice, Institutional Review, and Continuing Access Barrier**

98. Plaintiff made written complaints about the NWH and MGH incidents to MGB and hospital leadership via hand-delivery to supervisory staff, regular mail, and email, including to NWH President Ellen A. Moloney, and to the personal email of MGB Chief Executive Officer Anne Klibanski at aklibanski@partners.org, beginning contemporaneously on or around September 13, 2023 and continuing afterward. Plaintiff was told orally and in writing that these executives reviewed his complaints of discrimination and his requests for accommodation or modification.

99. On or around October 17, 2023, MGB and MGH Office of Patient Advocacy responded to Plaintiff's complaints and requests to Anne Klibanski and Ellen Moloney. MGB and MGH stated that Plaintiff was discharged because he "would not comply with unit policies, such as relinquishing [his auxiliary aid]." The response did not allow Plaintiff's request for a reasonable modification to the policies of MGB, MGH, or NWH, and did not offer an effective alternative.

100. On April 3, 2024, NWH Patient Relations responded to Plaintiffs complaints and requests after a review involving NWH's Medical Director, Nurse Director, attending psychiatrist, and interviews with key staff. NWH stated it found that the alleged conduct by NWH employees, agents, or personnel were appropriate and specifically relied on a policy prohibiting recording auxiliary aid devices on hospital units, and did not offer any equally effective alternative.

101. On or around May 3, 2024, counsel for MGB, MGH, and NWH stated that the law firm represented MGB concerning Plaintiffs complaints and evidence-preservation correspondence and MGB's obligations. On June 17, 2024, counsel for NWH stated that NWH had reviewed Plaintiffs allegations and denied the $3,800 property claim. On October 21, 2024, counsel stated that NWH had investigated Plaintiffs malpractice allegations and would not settle. Plaintiff alleges these responses show institutional notice, review, and preservation of the challenged practices.

102. On or around December 7, 2023, MGB or MGH entered and maintained the

following adverse instruction and security alert in Plaintiff's permanent medical records: "Please note: Patient has recorded conversations with providers on his [auxiliary aid] in hospital settings. Notify Police and Security when patient presents." A redacted copy is attached hereto as **Exhibit E.**

103. Plaintiff reviewed his MGB or MGH medical records on or around August 2026 and confirmed that the chart instruction remained present. Plaintiff has received no written rescission of that continuing security alert, his exclusion from NWH, or his exclusion from MGH.

104. On information and belief, the security alert is maintained through an MGB-affiliated electronic-health-record environment and may be visible to all MGB-affiliated facilities and hospitals beyond MGH and NWH. Plaintiff seeks relief against MGB only to the extent discovery confirms that MGB itself controls, administers, maintains, or directs the relevant systemwide security alert against his auxiliary aid and disability access.

105. Plaintiff continues to require neurology, psychiatry, emergency-department, and potentially inpatient services of the types provided within the MGB system. He intends to use MGH, NWH, or other MGB services when medically appropriate if he can do so without a substantial risk that requesting an effective-communication aid will automatically trigger physical violence by security, forced strip searching, device seizure, or exclusion from treatment and service.

106. Plaintiff has avoided returning to MGH and NWH because of the continuing security alert, the unrescinded exclusionary statements, and the prior threats of force, intimate nude searches, contact with his genitals, seizure of his auxiliary aid, and denial of accommodation. Those barriers presently deter his access to facilities he otherwise would use for medically appropriate services.

**H. Rights of a Psychiatric Patient and Institutional Standards**

107. To the extent NWH's psychiatric unit was operated by, licensed by, or contracting with the Massachusetts Department of Mental Health, M.G.L. c. 123, Section 23 protected Plaintiff from harassment or reprisal, including denial of appropriate treatment, stabilization, privacy, personal safety, and access to patient advocates, human-rights officers, or attorneys.

108. To the extent applicable, 104 CMR 27.13 likewise protected Plaintiff's human rights, including the right to file complaints and receive responses, the right to be free from unreasonable searches of person or property, and rights to receive information and assistance concerning human rights. Plaintiff alleges that these standards informed Defendants' duties and constitute secured rights or relevant standards for the Massachusetts Civil Rights Act and negligence pleaded below.

## I. Injuries and Damages

109. Plaintiff alleges that the September 14, 2023 NWH head strike and the September 15, 2023 MGH distress-induced fall caused or materially contributed to new head injury and substantial worsening of neurological symptoms. Later clinicians documented TBI or post-concussive conditions and significant cognitive decline after the events. To the extent a particular later diagnosis requires expert causation proof, Plaintiff alleges that it developed or materially worsened after the September 2023 injuries and will rely on admissible expert evidence.

110. As a direct and proximate consequence of Defendants' conduct on September 13 through September 15, 2023, Plaintiff attempted suicide on September 16, 2023 and multiple times thereafter, requiring inpatient psychiatric hospitalizations at other hospitals on or around December 28, 2023, January 26, 2024, May 8, 2025, and July 22, 2025. Before the September 2023 events at NWH and MGH, Plaintiff had not previously experienced any suicidal ideations or suicide attempts.

111. On October 9, 2023, a crisis-service record documented Plaintiff's continuing harm following the severe physical and emotional injuries at NWH and MGH, including confusion and disorientation, inability to recall basic information, memory loss, use of a talk-to-text assistive device, and Plaintiff's report that he had hit his head at NWH and MGH and had been refused emergency evaluation, treatment, or services. Later records document TBI and post-concussive symptoms, psychosis, memory impairment, and multiple subsequent psychiatric hospitalizations.

112. Plaintiff alleges that the Defendants' conduct caused or aggravated ongoing PTSD, severe depression, recurrent nightmares and flashbacks about the events, loss of sleep, panic and

anxiety disorders, trauma symptoms, psychotic symptoms, functional neurological episodes, severe migraines or headaches requiring prescribed monthly injections, cognitive impairment, and chronic pain; caused physical injuries including head and neck pain and bruising; and required extensive emergency, neurological, psychiatric, rehabilitation, medication, and related treatments.

113. As a direct and proximate consequence of the Defendants' conduct, Plaintiff suffered, and continues to suffer, severe physical and emotional injuries, including, but not limited to, bruising; intramuscular injuries; increased migraines; terrifying memories of forced stripping, rape, or sexual assault; and substantially deteriorated psychiatric conditions.

114. Plaintiff worked in investment banking before becoming disabled and last worked in approximately 2021, with historical annual earnings generally in the range of approximately $85,000 to $150,000. He acknowledges that he received disability benefits before September 2023. His claim is that the new and worsened cognitive, neurological, and psychiatric impairments further reduced his residual earning capacity and realistic path back to analytical or finance work.

115. Plaintiff seeks relief for medical expenses and future treatment costs in amounts to be proven; loss of property; loss or impairment of earning capacity; other economic losses; physical pain; emotional distress and dignitary harm where recoverable under the particular cause of action; statutory or nominal damages where available; and equitable relief.

## CLAIMS FOR RELIEF

## COUNT ONE

### ADA TITLE III - DISABILITY DISCRIMINATION, REASONABLE MODIFICATION, AND EFFECTIVE COMMUNICATION (Against MGB to the extent of its direct conduct, GHC/MGH, and NWH)

116. Plaintiff incorporates the above paragraphs by reference as if fully set forth herein.

117. MGH and NWH own, lease, or operate places of public accommodation within 42 U.S.C. Section 12181(7). MGB is liable under this count only to the extent it itself operates or controls a covered service or directly maintains the challenged systemwide policy or practice.

118. Plaintiff is an individual with an actual disability, has a record of disability, and was also regarded as disabled by Defendants. He was eligible to receive the hospitals' emergency, psychiatric, neurological, and related services.

**A. Failure to Make Reasonable Modifications to Search Policies**

119. Title III of the ADA prohibits failure to make reasonable modifications in policies, practices, or procedures when modifications are necessary to afford goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity demonstrates a fundamental alteration or undue financial burden.

120. Plaintiff requested trauma-sensitive modifications to forced stripping and intimate-search practices after disclosing his PTSD and a history of rape and sexual assault. He proposed less-intrusive alternatives, including a pat-down or use of a search wand, and alleges that no individualized safety basis for the more intrusive touching was communicated and no less-intrusive effective alternative was attempted first.

121. Plaintiff alleges that NWH and MGH denied those modification requests through categorical psychiatric-patient nude search or device-search practices rather than an individualized assessment of whether legitimate safety objectives could be satisfied by a less-intrusive method.

**B. Failure to Furnish Appropriate Auxiliary Aids and Effective Communication**

122. Title III of the ADA and 28 C.F.R. Section 36.303 require a public accommodation to furnish appropriate auxiliary aids and services, such as "audio recordings," "real-time computer-aided transcription services," "software," and "devices," where necessary to ensure effective communication. The appropriate method depends on the individual's communication method and the nature, length, complexity, and context of the communication; the public accommodation may choose the method only if the chosen method actually results in effective communication.

123. Plaintiff alleges that, after notice that an ordinary unassisted oral communication was ineffective during acute symptoms, Defendants categorically rejected his transcription-based aid

and failed to furnish any alternative method that enabled him to process, retain, and respond to complex, one-on-one treatment-related communications with comparable effectiveness.

124. The alleged deficiencies were especially consequential during complex psychiatric, discharge, consent, safety, and neurological discussions in which Plaintiff's ability to process and retain information was impaired and immediate decisions affected his treatment and liberty.

125. Plaintiff alleges that the categorical denials, search practices, exclusion from services, and continuing disability-related security alert on his permanent medical records denied him full and equal access because of disability or the absence of necessary aids or modifications, rather than merely reflecting a disagreement about medical treatment.

126. Plaintiff faces a real and ongoing access barrier because the security alert remained in his record in August 2026 and the alleged exclusions have not been rescinded. He intends to use MGB-system services when medically appropriate if the discriminatory barrier is removed.

127. Plaintiff seeks prospective and declaratory relief, costs, and attorney's fees available under 42 U.S.C. Sections 12188 and 12205.

## COUNT TWO

### ADA TITLE V - RETALIATION, COERCION, THREATS, AND INTERFERENCE (Against MGB to the extent of its direct conduct, GHC/MGH, and NWH)

128. Plaintiff incorporates the above paragraphs by reference as if fully set forth herein.

129. Plaintiff engaged in protected activity by requesting disability modifications and auxiliary aids; attempting to use an aid after notice; complaining about disability discrimination; requesting a patient advocate or human-rights officer; refusing to surrender or delete evidence created by the aid; reporting alleged assault to police; and expressing an intent to pursue legal remedies and testify regarding the alleged actions or omissions by NWH and MGH personnel.

130. Plaintiff alleges that, because of protected activity, institutional personnel threatened discharge or adverse treatment, attempted to seize or delete his auxiliary-aid recording, terminated

clinical interactions, "orally trespassed" and removed him from the hospitals, restricted future access, and caused or maintained a security alert associated with his disability-based auxiliary aid.

131. Plaintiff alleges a causal connection through the close temporal sequence, the threats by Dr. Kramer and Zubieta described above, the recorded Ferzoco and Dr. Beach statements, the police and fire documentation, and the recording-based security alert placed in his medical records.

132. The alleged threats of harm, pressured deletion of evidence or surrender of a disability aid, forced removal, exclusion from services, and use of physical violence would deter a reasonable person from requesting disability accommodations or reporting discrimination.

133. Plaintiff seeks prospective and declaratory relief, costs, and attorney's fees available for an ADA Title V retaliation or interference claim premised on ADA Title III rights.

## COUNT THREE

### SECTION 504 OF THE REHABILITATION ACT, 29 U.S.C. SECTION 794 (Against MGB to the extent of its direct federally funded program or activity, GHC/MGH, and NWH)

134. Plaintiff incorporates the above paragraphs by reference as if fully set forth herein.

135. On information and belief, MGH and NWH receive federal financial assistance, including through federal health-care programs or grants, and their relevant hospital programs are programs or activities within Section 504 of the Rehabilitation Act. MGB is included only to the extent its own relevant program or activity receives federal financial assistance and directly participates in the challenged conduct.

136. Plaintiff is a qualified individual with a disability who sought emergency, psychiatric, neurological, and related health services for which he was otherwise eligible.

137. This count focuses on disability causation, not retaliation for complaints. Plaintiff alleges that the accommodation and access denials actionable under this count were imposed solely by reason of his disability, disability-related communication limitations, trauma-related limitations, or disability stereotypes, including the alleged rationale that he was "not deaf" and therefore did not

need any reasonable accommodations for his "unnamed disability," the allegation that his known disabilities diagnosed by MGH physicians were "fake" or "feigned," and the categorical refusal to modify intimate-search practices despite Plaintiff's known trauma disabilities.

138. Plaintiff alleges purposeful or intentional disability discrimination based on the disability-related rationales described above; allegations of "faking" or "feign[ing]" based on a bias towards Plaintiff's disabilities, resulting in refusals to provide necessary emergency services and care; refusals to allow modifications after notice of functional limitations; categorical rules that denied any effective alternative; and the continuing security alert that associates presentation to the hospital with forced removal or harm by security because of Plaintiff's use of a communication aid.

139. To the extent First Circuit law recognizes deliberate indifference as an alternative means of establishing intentional discrimination for compensatory relief, Plaintiff further alleges that appropriate decisionmakers knew that denial of an effective communication method or a trauma-sensitive modification was substantially likely to violate federally protected rights and deliberately failed to act on that risk.

140. Plaintiff seeks equitable and declaratory relief, attorney's fees and costs under 29 U.S.C. Section 794a, and pecuniary or other compensatory damages legally available.

## COUNT FOUR

### SECTION 1557 OF THE AFFORDABLE CARE ACT, 42 U.S.C. SECTION 18116 - ALTERNATIVE (Against MGB to the extent of its directly covered health program, GHC/MGH, and NWH)

141. Plaintiff incorporates the above paragraphs by reference as if fully set forth herein.

142. The institutional Defendants operate health programs or activities that receive federal financial assistance and are covered by Section 1557 to the extent alleged above.

143. For disability discrimination, Section 1557 incorporates the substantive protections and enforcement framework of Section 504. Plaintiff is a qualified individual with a disability who sought covered health services.

144. For the reasons pleaded in Count Three, Plaintiff alleges that the disability-based denials within this count occurred solely by reason of disability-related needs or disability stereotypes or biases and constituted purposeful or intentional discrimination. Retaliation for protected complaints is pleaded separately under Count Two and is not relied on as the sole causal basis for this discrimination count.

145. To the extent deliberate indifference is legally sufficient as an alternative route to compensatory relief, Plaintiff pleads it only in the alternative on the same limited basis stated in the above paragraphs.

146. Plaintiff seeks declaratory and equitable relief, attorney's fees and costs where available, and pecuniary or other compensatory relief legally available.

## COUNT FIVE

### EMERGENCY MEDICAL TREATMENT AND LABOR ACT, 42 U.S.C. SECTION 1395dd - ALTERNATIVE (Against GHC/MGH only)

147. Plaintiff incorporates the above paragraphs by reference as if fully set forth herein.

148. MGH is a participating hospital with a hospital emergency department subject to the Emergency Medical Treatment and Labor Act ("EMTALA").

**A. Second-Presentation Medical Screening Violation**

149. This count principally concerns Plaintiff's second September 15, 2023 presentation at MGH after the first discharge. After a new seizure or convulsive episode, fall, head strike, loss of consciousness, and bleeding, Plaintiff requested a new emergency evaluation and registration.

150. Plaintiff alleges that MGH refused to create a new registration or provide any new appropriate medical screening examination within the capability of its emergency department. He alleges a complete screening refusal, not merely disagreement with the adequacy of a screening.

151. Boston Fire records contemporaneously document that the Plaintiff stated MGH had refused treatment and that hospital security reported to Boston Fire that Plaintiff was being removed

on a doctor's order while treatment was being refused by Dr. Leslie and Dr. Beach. Boston Police records document that Plaintiff requested treatment, that hospital personnel said there were "no further services" they would provide, and that police transported him elsewhere for treatment.

152. EMTALA's screening duty does not depend on proof that the refusal was motivated by inability to pay. Plaintiff pleads the recording dispute and prior exclusion only as context for why a new screening allegedly was not provided, not as a separate statutory element.

**B. Stabilization Theory Pleaded Only in the Alternative**

153. If discovery establishes that MGH actually determined that Plaintiff had an emergency medical condition during the second presentation, Plaintiff alleges in the alternative that MGH failed to provide stabilizing treatment within its available staff and facilities or an appropriate transfer before exclusion. Plaintiff does not assume the stabilization duty without proof of the predicate determination required by 42 U.S.C. Section 1395dd(b).

**C. Equitable Tolling**

154. EMTALA provides a two-year limitations period. Plaintiff invokes equitable tolling solely for this alternative count based on extraordinary mental and neurological incapacity that existed when the claim accrued and materially continued until 2026, preventing him from comprehending and effectively managing federal litigation despite intermittent ability to complete discrete tasks with substantial assistance.

155. Before the events at NWH and MGH, Plaintiff's neurologist, Dr. Finkelstein, documented on September 11, 2023 that Plaintiff continued to experience severe "neuropsychiatric symptoms" and "significant incapacity," including impaired memory, comprehension, and executive functioning, and that she has "significant concerns about [Plaintiff's] ability to meaningfully engage in the legal process and to assist in the presentation of his case." On February 3, 2023 and again on March 15, 2024, Plaintiff's physicians executed sworn medical certifications stating that Plaintiff lacked capacity to conduct litigation, could not understand or act on legal

proceedings, could not adequately assist in presenting a case, and that mental illness prevented his timely filing of claims. In further support, the Massachusetts Trial Court adjudicated Plaintiff legally incapacitated and incompetent, appointed a guardian ad litem to protect his interests, and ordered substitute-decision-making arrangements beginning 2022 through November 2024.

156. Plaintiff's submission of pleadings or correspondences does not negate his adjudicated legal incapacity and incompetence, and the pleadings or correspondences do not require the same sustained cognitive, psychiatric, and executive functioning demanded by full litigation.

157. Plaintiff alleges that his capacity materially improved in 2026 and that he then acted to prepare this action. He invokes equitable tolling to the extent federal law permits it.

158. Plaintiff seeks personal-injury damages available under Massachusetts law through 42 U.S.C. Section 1395dd(d)(2)(A) and such equitable relief as is appropriate if this alternative count is sustained.

**COUNT SIX**

**MASSACHUSETTS PUBLIC ACCOMMODATIONS LAW, M.G.L. c. 272, SECTION 98**
**(Against MGB to the extent of direct participation, GHC/MGH,**
**NWH, Kramer, Ferzoco, Beach, and Leslie)**

159. Plaintiff incorporates the above paragraphs by reference as if fully set forth herein.

160. MGH and NWH are places open to and accepting the patronage of the general public within M.G.L. c. 272, Section 92A. MGB is included only to the extent it directly controlled or maintained a challenged public-accommodation practice.

161. M.G.L. c. 272, Section 98 prohibits distinction, discrimination, or restriction on account of physical or mental disability relative to admission to or treatment in a place of public accommodation and imposes liability on persons who directly discriminate or knowingly aid or incite such discrimination.

162. Ferzoco directly restricted Plaintiff's treatment in or equal access to a place of public accommodation on the account of disability by refusing a trauma-related reasonable modification to

forced strip searches based on Ferzoco's assertion that disability rights did not apply to psychiatric patients within the NWH facility, by refusing Plaintiff's request to use an auxiliary aid for effective communication, and by refusing to provide Plaintiff with an equally effective alternative.

163. Dr. Kramer directly restricted Plaintiff's admission to, treatment in, or equal access to a place of public accommodation on the account of disability by denying Plaintiff the communication aid based on the asserted rationale that Plaintiff was "not deaf" and did not need accommodations for an "unnamed disability," by refusing a hospital-provided effective alternative, and by enforcing disability-related restrictions through violence, physical force, or discharge.

164. Dr. Beach directly restricted Plaintiff's admission to, treatment in, or equal access to a place of public accommodation on the account of disability by refusing the effective communication aid categorically, refusing a trauma-sensitive modification to forced strip searches, and using the disability device dispute as a basis for forced confinement in a closed room, nonconsensual contact with Plaintiff's genitals, nonconsensual anal penetration, discharge, exclusion from services, or by having security use physical force to remove Plaintiff from MGH.

165. Dr. Leslie directly restricted Plaintiff's admission to, treatment in, or equal access to a place of public accommodation on the account of disability by refusing to provide requested emergency services on the assertion that Plaintiff made "accusations of trauma and assault" against MGB-affiliated personnel, by discharging or excluding Plaintiff from services while his head injury was bleeding during his second presentation to MGH Emergency Department on September 15, 2023, or by having MGH security guards use physical force to remove Plaintiff from MGH.

166. Plaintiff alleges that NWH and GHC/MGH are liable for their own public-accommodation practices and for acts legally attributable to them. MGB is liable only to the extent it directly controlled or maintained the challenged systemwide practice.

167. To the extent Plaintiff alleges aid or incitement, he will prove a distinct underlying discriminatory act, the aider's knowledge and shared discriminatory intent, and substantial

assistance in that act. He does not seek duplicative recovery against more than one person for the same act of discrimination, consistent with the limitation of M.G.L. c. 272, Section 98, while preserving recovery for separate acts committed by different persons.

168. Plaintiff seeks actual and statutory damages, punitive damages if authorized and the governing standard is proved, equitable and declaratory relief, and attorney's fees and costs to the extent authorized by Massachusetts law.

## COUNT SEVEN

### MASSACHUSETTS CIVIL RIGHTS ACT, M.G.L. c. 12, SECTIONS 11H-11I (Against MGB to the extent of direct conduct, GHC/MGH, NWH, Kramer, Ferzoco, Beach, Leslie, Lucas, Santos, Casey, and participating Roe Security Defendants)

169. Plaintiff incorporates the above paragraphs by reference as if fully set forth herein.

170. Plaintiff possessed rights secured by federal and Massachusetts law, including rights to nondiscriminatory access to public accommodations, disability-related modifications and effective communication, rights under M.G.L. c. 111, Section 70E, and, to the extent applicable to the NWH psychiatric unit, rights under M.G.L. c. 123, Section 23 and 104 CMR 27.13.

171. Dr. Kramer, separate from the underlying deprivation of Plaintiff's rights, interfered with rights secured by federal and Massachusetts law when she undertook coercive action designed to make Plaintiff surrender or stop exercising his rights after he invoked disability-related rights, complained about discrimination, and sought to preserve evidence of the challenged conduct. Dr. Kramer threatened Plaintiff with force, discharge, restriction to services, or loss of treatment if he continued his complaints; personally used physical force and caused security personnel to restrain Plaintiff while attempting to compel him to surrender his auxiliary aid and the recording directly tied to his disability, and caused him physical injuries and a seizure. Dr. Kramer directed security personnel to use physical force to prevent Plaintiff from accessing the NWH Emergency Department for services or evaluation of his injuries and to remove or exclude him from NWH when he continued to request accommodation, complain of discrimination, and seek necessary

treatment and services. Dr. Kramer's threatened loss of care or services and her use of actual and threatened physical force intentionally placed Plaintiff in fear of additional physical, emotional, and psychological harm and were used not merely to accomplish the underlying restraint or exclusion, but to compel him to cease his discrimination complaints, surrender his auxiliary aid, abandon further accommodation requests, and forego efforts to obtain continued medical services. Plaintiff therefore alleges that those threats, intimidation, and coercion constituted means of interfering, and attempting to interfere, with secured rights within the meaning of M.G.L. c. 12, §§ 11H–11I.

172. Dr. Beach interfered, and attempted to interfere, with Plaintiff's exercise and enjoyment of secured rights through threats, intimidation, and coercion separate from the underlying deprivation of those rights. Dr. Beach confined Plaintiff in a closed room against his will, controlled or physically obstructed the exit when Plaintiff attempted to leave and obtain help, and used the presence and threatened intervention of MGH security personnel to compel compliance with a nude search based on Dr. Beach's assertion that MGH policy required him to locate and seize Plaintiff's auxiliary aid or recording device. Notwithstanding Plaintiff's repeated statements that he did not consent and his disclosure that forced nudity and intimate touching would trigger trauma-related disabilities associated with rape, Dr. Beach forcibly removed or required removal of Plaintiff's clothing and underwear, made nonconsensual contact with his penis, testicles, genital and anal areas, and digitally penetrated his anus in attempting to locate the device. Dr. Beach thereafter threatened security intervention and exerted pressure intended to compel Plaintiff to reveal or surrender the auxiliary aid, compel deletion of the recording or other preserved evidence, cease using the auxiliary aid, and abandon his discrimination complaints and accommodation requests. When Plaintiff refused, Dr. Beach allegedly caused or directed security personnel to forcibly remove and exclude him from MGH and thereby prevented his continued access to emergency evaluation, treatment, and stabilization. Plaintiff alleges that the confinement, threatened security force, threatened loss of treatment, and actual use of force were intended not merely to

effectuate the search or discharge, but to place him in fear of additional physical or psychological harm and to compel him to surrender, or deter him from exercising, independently secured rights.

173. Ferzoco interfered, and attempted to interfere, with Plaintiff's exercise and enjoyment of secured rights through threats, intimidation, and coercion separate from the underlying denial of accommodation. After Plaintiff disclosed his trauma-related disabilities, expressly withheld consent to the touching of his private parts and requested a less-intrusive search modification, Ferzoco threatened him with physical forced by security personnel, compelled him to become fully nude, and subjected him to nonconsensual contact rather than permit the requested alternative. Thereafter, when Plaintiff expressly invoked the ADA and requested use of his auxiliary aid for effective communication, Ferzoco rejected the communication aid, terminated the clinical interaction, and immediately threatened that Plaintiff would be denied services and discharged. These acts were used not merely to deny the requested accommodations, but to exert physical force or psychological pressure intended to compel or deter Plaintiff from persisting in his rights, accommodation requests, objecting to nonconsensual nudity and touching, using his auxiliary aid, and continuing to assert his disability-related rights.

174. Lucas participated in efforts to pressure Plaintiff to abandon or refrain from pursuing complaints concerning the NWH incidents and later communicated, on Boston Police body-worn camera, that Plaintiff was not permitted to return to MGH because he had used his auxiliary aid. Plaintiff alleges that this statement reinforced the threatened and actual exclusion from further medical services and was intended to deter him from continuing to pursue disability-related complaints, use his auxiliary aid, preserve evidence, or seek further services and treatment at MGH.

175. Dr. Leslie threatened to withhold or discontinue requested treatment if Plaintiff continued pursuing his discrimination complaint, thereby using the threatened loss of medical care as pressure intended to compel Plaintiff to abandon or refrain from exercising his protected rights.

176. Santos, Casey, and participating Roe security personnel used actual or threatened

physical force to implement exclusionary orders and compel Plaintiff to surrender access to the hospitals, his auxiliary aid, or necessary medical services. Physical force is pleaded as the coercive means, not merely as the underlying deprivation.

177. The institutional Defendants are alleged principally to be directly liable for their own policies, authorized decisions, ratification, and maintenance of the auxiliary aid exclusion and security alert on Plaintiff's medical records. Vicarious liability is pleaded only in the alternative to the extent Massachusetts law permits it and is not the sole basis of the institutional claim under the Massachusetts Civil Rights Act.

178. Plaintiff alleges that the threats, intimidation, or coercion were used intentionally to cause him to abandon, refrain from, or surrender protected rights and that he did not voluntarily waive those rights.

179. Plaintiff seeks compensatory damages, injunctive and declaratory relief, and attorney's fees and costs under M.G.L. c. 12, Section 11I.

## COUNT EIGHT

### ASSAULT
**(Against Kramer, Ferzoco, Beach, Santos, Casey, the NWH Counselor, Roe Security Defendants, and NWH/GHC under respondeat superior where applicable)**

180. Plaintiff incorporates the above paragraphs by reference as if fully set forth herein.

181. The identified individual Defendants intentionally engaged in conduct that caused Plaintiff reasonably to apprehend imminent harmful or offensive contact, including threats or immediate acts of forcible stripping, restraint, device seizure, and physical removal.

182. Given Plaintiff's express non-consent, known trauma history of rape and sexual assault, the presence of security personnel, and the threatened use of force, the alleged conduct created an objectively reasonable apprehension of immediate unwanted contact.

183. The acts occurred within the course and scope of hospital functions or under hospital direction to the extent respondeat-superior liability applies.

184. As a direct and proximate result of the Defendants' conduct, Plaintiff suffered, and continues to suffer, physical and emotional injuries and other damages.

## COUNT NINE

### BATTERY
### (Against Kramer, Ferzoco, Beach, Santos, Casey, the NWH Counselor, Roe Security Defendants, and NWH/GHC under respondeat superior where applicable)

185. Plaintiff incorporates the above paragraphs by reference as if fully set forth herein.

186. Plaintiff alleges intentional, nonconsensual, harmful or offensive physical contact, including Ferzoco's intimate skin-check touching; the force used by Dr. Kramer and NWH security during the attempted device seizure; the NWH Counselor grabbing and shaking Plaintiff causing a head strike; the force during removal from NWH; Dr. Beach's touching of Plaintiff's genitals and digital anal penetration during the device search; and force used by MGH security during removal.

187. Plaintiff expressly withheld consent to the intimate searches and did not consent to force used to obtain his auxiliary aid or remove him. To the extent Defendants assert clinical, safety, or privilege defenses, Plaintiff alleges that the degree, purpose, or manner of the contact exceeded any lawful or medically necessary scope.

188. The acts occurred within the course and scope of hospital functions or under hospital direction to the extent respondeat-superior liability applies.

189. As a direct and proximate result of the Defendants' conduct, Plaintiff suffered, and continues to suffer, physical injury and pain, ongoing physical pain from his head and running down to his spine and legs, migraine pain, trauma, extreme emotional distress and consequential damages.

## COUNT TEN

### INTENTIONAL OR RECKLESS INFLICTION OF EMOTIONAL DISTRESS
### (Against Kramer, Ferzoco, Beach, Santos, Casey, the NWH Counselor, participating Roe Defendants, and NWH/GHC under respondeat superior where applicable)

190. Plaintiff incorporates the above paragraphs by reference as if fully set forth herein.

191. Plaintiff alleges extreme and outrageous conduct, including nonconsensual stripping

and nude intimate touching of a known survivor of rape and sexual assault, forced anal penetration during nude search, repeated use of physical force after disability complaints, threats to terminate or withhold care and services because Plaintiff would not abandon protected activity, forced physical removal from NWH and MGH while he reported suicidality and head-injury symptoms, and other adverse conduct by Defendants described in the paragraphs above.

192. Defendants knew or should have known that their conduct was likely to cause severe emotional distress. Defendants were on notice or should have been on notice of Plaintiff's medical history, rape or sexual assault status, and emotional vulnerability when they engaged the conduct described in the paragraphs above. Defendants' conduct were extreme and outrageous, and beyond all possible bounds of decency in a hospital setting where patients can expect to receive care.

193. The individual Defendants allegedly intended to cause severe distress or knew that severe distress was highly likely, particularly after Plaintiff disclosed PTSD, sexual-trauma triggers, acute psychiatric crisis, and suicidal symptoms.

194. As a direct and proximate consequence of Defendants' conduct on September 13 through September 15, 2023, Plaintiff attempted suicide on September 16, 2023 and multiple times thereafter, requiring inpatient psychiatric hospitalizations at other hospitals on or around December 28, 2023, January 26, 2024, May 8, 2025, and July 22, 2025. Before the September 2023 events at NWH and MGH, Plaintiff had not previously experienced any suicidal ideations or suicide attempts.

195. Plaintiff experienced extreme emotional distress manifested by panic, trauma symptoms, distress-induced seizures, functional neurological episodes, suicidal crises, multiple inpatient psychiatric hospitalizations at other hospitals, and ongoing treatments at other hospitals.

196. To the extent the conduct were committed within the scope of employment, Plaintiff seeks to hold NWH and GHC/MGH responsible under applicable respondeat-superior principles.

## COUNT ELEVEN

**CONVERSION**
**(Against NWH, Ferzoco, and presently unidentified NWH personnel responsible for Plaintiff's property)**

197. Plaintiff incorporates the above paragraphs by reference as if fully set forth herein.

198. Plaintiff owned and had the immediate right to possess $3,800.00 in cash that he brought to NWH and that was placed with or taken into NWH custody during admission.

199. When Plaintiff's property was returned, the cash was missing. Plaintiff promptly demanded its return, but Ferzoco stated that the money had been confiscated under hospital policy.

200. On June 17, 2024, NWH, through written correspondence by its counsel, refused to return the confiscated cash. To date, no portion of the $3,800.00 has been returned. Plaintiff alleges wrongful dominion and control inconsistent with his ownership rights.

201. Plaintiff asserts conversion based on his personal observations, contemporaneous photographs, contemporaneous complaint, demand for return, and the responses he received. Plaintiff seeks the value of the property, interest, and other legally recoverable damages.

## COUNT TWELVE

**PROFESSIONAL NEGLIGENCE / MEDICAL MALPRACTICE**
**(Against NWH, GHC/MGH, Kramer, Ferzoco, Beach, Leslie, and Lucas)**

202. Plaintiff incorporates the above paragraphs by reference as if fully set forth herein.

203. Defendants owed Plaintiff duties to exercise the degree of care and skill of the average qualified practitioner or comparable healthcare provider under the circumstances and to comply with professional standards governing psychiatric discharge, suicide-risk assessment, emergency evaluation, neurological complaints, and clinically driven search or restraint decisions.

204. Plaintiff alleges professional negligence, to the extent expert medical judgment is implicated, in failing to adequately evaluate and treat the September 14, 2023 head injury and loss of consciousness; failing to adequately assess and respond to reported suicidality; failing to

document suicidality in Plaintiff's medical records in order to justify discharging him and refusing to provide necessary care; discharging him without reasonably safe psychiatric stabilization or discharge planning; failing to provide appropriate emergency and neurological assessment; using or authorizing intrusive search or restraint decisions without adequate individualized clinical necessity; and failing to recognize or appropriately respond to seizure-like and neurological symptoms.

205. Plaintiff alleges that a reasonably qualified provider would have undertaken additional assessment, stabilization, referral, transfer, observation, or less-intrusive measures under the circumstances and that the departures caused or materially contributed to physical injury, psychiatric decompensation, suicide risk, delayed treatment, and other damages.

206. NWH and GHC/MGH are liable for their own professional duties and, where applicable, for professional negligence of employees or agents acting within the scope of their duties.

207. Plaintiff will present expert evidence required by Massachusetts law and will comply with the medical-malpractice tribunal procedures under M.G.L. c. 231, Sections 60B-60E. M.G.L. c. 231, Section 60L(j) is pleaded as an independent exemption from pre-suit notice to the extent this action is filed within six months of the applicable limitations deadline.

## COUNT THIRTEEN

### MASSACHUSETTS PATIENTS' RIGHTS LAW, M.G.L. c. 111, SECTION 70E (Against NWH, GHC/MGH, Ferzoco, Beach, and participating healthcare personnel as legally applicable)

208. Plaintiff incorporates the above paragraphs by reference as if fully set forth herein.

209. Plaintiff was a patient at facilities covered by M.G.L. c. 111, Section 70E.

210. Section 70E protects, among other things, the right to have reasonable requests responded to in a prompt manner and adequately within the facility's capacity; the right, upon request, to obtain applicable facility rules; the right to refuse examination, observation, or treatment by facility staff without jeopardizing access to psychiatric, psychological, or other medical care; the right to privacy during medical treatment or other rendering of care within the facility's capacity;

and the right to informed consent to the extent provided by law.

211. Defendants violated those protections by disregarding Plaintiff's requests for a patient advocate, facility rules, and reasonable accommodations; conditioning continued access to services and care on submission to nonconsensual nude touching or surrender of disability-related personal communication technology; failing to provide reasonable modifications or an effective process where applicable; and denying privacy or informed consent during nude, intimate searches.

212. Plaintiff alleges that the refusal of nonconsensual touching or nude examination was used to jeopardize or terminate his access to psychiatric or other medical services and care, contrary to the statutory protection against loss of care for refusing examination by a particular staff.

213. Section 70E expressly permits a civil action under M.G.L. c. 231, Sections 60B-60E. Plaintiff pleads this count subject to those procedures and seeks all relief available under the statute.

## COUNT FOURTEEN

### FALSE IMPRISONMENT
### (Against Beach and GHC/MGH)

214. Plaintiff incorporates the above paragraphs by reference as if fully set forth herein.

215. Dr. Beach directed Plaintiff into a closed room, closed the door and blinds, blocked or controlled the exit, and, during the nonconsensual nude search, physically or through an immediate threat of security force prevented him from leaving after he asked to stop or leave.

216. Plaintiff reasonably understood that he could not leave the confinement because Dr. Beach stated that Plaintiff was not allowed to leave the closed room, and until Dr. Beach later stated on the recording that the confinement had been lifted, stating: "nobody is holding you anymore."

217. Plaintiff was conscious of and harmed by the confinement and did not consent to it. He does not base this count on any period of lawful psychiatric detention under M.G.L. c. 123.

218. To the extent Dr. Beach acted within the scope of his work, GHC/MGH is vicariously liable under applicable Massachusetts law.

**COUNT FIFTEEN**

**NEGLIGENT INSTITUTIONAL POLICIES AND TRAINING - ALTERNATIVE (Against NWH and GHC/MGH)**

219. Plaintiff incorporates the above paragraphs by reference as if fully set forth herein.

220. In the alternative to the intentional-liability theories, NWH and GHC/MGH owed Plaintiff a duty to use reasonable care in adopting, communicating, and training on nonclinical institutional policies concerning disability accommodations, recording-based auxiliary aids, security escalation, trauma-sensitive search alternatives, patient-rights access, and emergency re-entry.

221. NWH and GHC/MGH maintained or enforced categorical restrictions on auxiliary aids or security/search practices without adequate disability-sensitive exceptions or training and that multiple employees relied on those rules in materially similar ways during a single episode of care.

222. After receiving Plaintiff's complaints, NWH conducted an internal review and expressly relied on its recording-device policy while finding no error. MGH later maintained an adverse, disability-related security alert in Plaintiff's permanent chart and medical records, directing all hospital staff to notify police and security to forcibly restrain and remove Plaintiff if he presents to MGH because he uses an auxiliary aid. Those facts support an inference, at the pleading stage, that relevant conduct involved institutional policy or training rather than a wholly isolated act.

223. Plaintiff does not assert negligent hiring or retention because he presently lacks facts showing prior notice of an employee's dangerous propensity. He does not use this count to relabel medical decisions requiring professional judgment; those theories are pleaded in Count Twelve.

224. The institutional negligence foreseeably caused or contributed to Plaintiff having suffered, and continuing to suffer, physical injury, trauma, denial of effective communication, unsafe exclusion or removal, and other damages.

## PRAYER FOR RELIEF

WHEREFORE, because Plaintiff and other patients with psychiatric, neurological, or other disabilities will suffer irreparable harm in the absence of permanent injunctive relief, Plaintiff respectfully requests that this Honorable Court:

A. Enter judgment in Plaintiff's favor on all counts;

B. Award Plaintiff his compensatory damages of over sixteen million dollars under 29 U.S.C. 794, M.G.L. c. 272, Section 98 (by reference to M.G.L. c. 151B, Section 5) and M.G.L. c. 12, Section 11H and 11I, and Massachusetts tort claims;

C. Award Plaintiff his reasonable attorney's fees and costs where authorized by federal or Massachusetts law, including as permitted under 42 U.S.C. Section 2205, 29 U.S.C. Section 794a(b), M.G.L. c. 272, Section 98 (by reference to M.G.L. c. 151B, Section 5) and M.G.L. c. 12, Section 11I;

D. Declare that the challenged disability-based practices, retaliation, coercive enforcement, and continuing access barriers related to communication aids violate the federal and state rights of Plaintiff;

E. Enjoin the institutional Defendants, their officers, agents, employees, and persons acting in concert with them from excluding Plaintiff and patients with neurological or psychiatric disabilities from medically appropriate MGH, NWH, or MGB-system services solely because of a request or use of a disability-related communication aid;

F. Order rescission of any trespass, exclusion, or "not welcome back" restriction that operates because of Plaintiff's protected complaints or use of an auxiliary aid;

G. Order removal of the instruction on Plaintiff's medical records and chart directing police or security involvement based on Plaintiff's lawful use of an auxiliary aid;

H. Require individualized assessment of effective-communication needs and appropriate auxiliary aids or services for Plaintiff and other patients with

neurological or psychiatric disabilities, including speech-to-text transcription or a comparably effective alternative for Plaintiff and other patients with disabilities;

I. Require individualized, trauma-informed assessment before forced disrobing or intimate searching and prohibit disability-based forced stripping or intimate searches absent lawful, documented, individualized necessity and consideration of less-intrusive effective alternatives for Plaintiff and patients with psychiatric disabilities;

J. Prohibit retaliatory seizure, compelled deletion, or compelled surrender of an auxiliary aid device or its contents because Plaintiff requested an reasonable accommodation, complained of discrimination, or engaged in protected activity;

K. Award compensatory and pecuniary damages on causes of action for which those remedies are legally available, including physical-injury, pain-and-suffering, economic, medical-expense, earning-capacity, property, and other damages;

L. Award damages under EMTALA only if Count Five is sustained and only to the extent authorized by 42 U.S.C. Section 1395dd(d)(2)(A) and applicable Massachusetts personal-injury law;

M. Award the value of the $3,800.00 allegedly converted by Defendants, together with applicable interest and other legally recoverable damages;

N. Award statutory, nominal, or minimum damages where authorized;

O. Award punitive damages on causes of action for which punitive damages are available;

P. Award prejudgment and postjudgment interest as permitted by law; and

Q. Grant such other and further relief as this Honorable Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on every issue so triable under Federal Rule of Civil Procedure 38 and applicable law; including, but not limited to, his claim for damages under Section 504 of the Rehabilitation Act, M.G.L. c. 272, Section 98, M.G.L. c. 12, Section 11H and 11I, and

under the state claims of negligence, intentional or reckless infliction of emotional distress, and assault and battery for compensatory and punitive damages.

Respectfully submitted,
JOHN DOE, Plaintiff, Pro Se

/s/ John Doe
John Doe
c/o Elizabeth Lunford ACP #1465
P.O. Box 9120
Chelsea, MA 02150
Phone: Not Available
Preferred Contact: a.kn47v@passinbox.com

Dated: September 7, 2026

**EXHIBIT LIST**

Exhibit A: Dr. Brian J. Smerkers' MGH sworn Certification of Medical Doctor as to Reasonable Accommodation of Patient for auxiliary aid, dated March 29, 2024.

Exhibit B: Auxiliary aid reasonable accommodation letter by MGH's licensed clinical social worker, Lacey Hochman, dated March 25, 2024.

Exhibit C: Massachusetts Department of Mental Health approval of the auxiliary aid audio recording and transcription accommodation, dated May 5, 2025 (offered as evidence of the reasonableness of the auxiliary aid).

Exhibit D: Dr. Sara Finkelstein MGH Neurology letter dated September 11, 2023, documenting significant incapacity and memory/comprehension/executive-function limitations.

Exhibit E: Redacted December 7, 2023 MGH medical-record page containing instruction to notify Police and Security to restrain or remove Plaintiff when he presents because he uses a disability-based auxiliary aid for effective communication with providers.

**CERTIFICATE OF SERVICE**

I certify that this complaint will be sent to the above-captioned Defendants electronically or via certified mail after this complaint is docketed in court and a case number is assigned.

Respectfully submitted,
JOHN DOE, Plaintiff, Pro Se

*/s/ John Doe*

John Doe
c/o Elizabeth Lunford ACP #1465
P.O. Box 9120
Chelsea, MA 02150
Phone: Not Available
Preferred Contact: a.kn47v@passinbox.com

Dated: September 7, 2026